[No. C020236. Third Dist. Apr. 30, 1996.]

BANK OF STOCKTON, Plaintiff and Respondent, v.
CHURCH OF SOLDIERS OF THE CROSS OF CHRIST OF THE
STATE OF CALIFORNIA, Defendant and Appellant.

**COUNSEL**

Michael Millen for Defendant and Appellant.

John B. Rudquist, Bray, Geiger, Rudquist & Nuss for Plaintiff and Respondent.

## OPINION

NICHOLSON, J.—We find ourselves in the domain where free speech and private property rights collide. A church solicited donations from a bank's customers on the bank's private property. The bank brought an action to enjoin the solicitation, and the trial court granted a preliminary injunction. We hold the bank can exercise its right to limit the activities of those who use the bank's property to activities related to the business of the bank, even though the solicitors desire to exercise a free speech right. Accordingly, we affirm.

### FACTS AND PROCEDURE

The plaintiff, Bank of Stockton, or the Bank, is a local bank with its main branch in downtown Stockton. This main branch, where the dispute in this case originated, is a two-story building with the Bank as its sole tenant and is adjoined on the north by a large parking lot owned by the Bank. A public sidewalk abuts the Bank on the south and west, and the main entrance is on the south end of the building; however, most customers use the north entrance, crossing the Bank's private sidewalk to enter the Bank from the parking lot.

The defendant, Church of Soldiers of the Cross of Christ of the State of California, or the Church, is a religious organization. Its members dress in white suits and hold white buckets, soliciting donations from passersby. The Church has in the past and wishes now to place its members on the private sidewalk between the parking lot and north entrance of the Bank to solicit donations from the Bank's customers as they enter and exit the Bank.

The Bank brought an action against the Church seeking an injunction prohibiting the Church from soliciting donations on the Bank's property. After a hearing, the trial court imposed a preliminary injunction enjoining the Church from soliciting on the Bank's property.

The Church appeals the preliminary injunction.

### DISCUSSION

■ To obtain a preliminary injunction, the plaintiff must establish the defendants should be restrained from the challenged activity pending trial. (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715,

672 P.2d 121]; *Planned Parenthood* v. *Wilson* (1991) 234 Cal.App.3d 1662, 1667 [286 Cal.Rptr. 427].) The plaintiff must show (1) a reasonable probability it will prevail on the merits and (2) that the harm to the plaintiff resulting from a refusal to grant the preliminary injunction outweighs the harm to the defendant from imposing the injunction. (*IT Corp.* v. *County of Imperial, supra,* at pp. 69-70.) On appeal, a preliminary injunction will be overturned only on a showing of abuse of discretion. (*Ibid.*) ■ We consider first whether it is reasonably probable the Bank will prevail on the merits. This requires a determination of whether the Bank can prohibit the Church's solicitation activities on Bank property.

In 1967, the California Supreme Court held unconstitutional an ordinance banning loitering in a railway station because it violated the free speech rights of those who wished to protest American involvement in the war in Vietnam. (*In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353].) The railway station was privately owned by three railroads and housed a restaurant, a snack bar, a cocktail lounge, and a magazine stand, in addition to the transportation facilities. (*Id.* at p. 847.) The court noted the railway station was like a public street or park. The private ownership seemed to play only a minor role in the court's determination of the outcome because the court was considering the validity of a municipal ordinance, not the desires of the private owners, to prohibit free speech. The court focused on the public setting of the railway station and the allowable restrictions on free speech in public settings without regard to the wishes of the private owners. (*Id.* at pp. 851-853.) The holding in *Hoffman* was based on the First Amendment of the United States Constitution. (*Id.* at p. 849.) The California Constitution was not mentioned.

In 1968, the United States Supreme Court held that, when streets and sidewalks within a privately owned shopping center are the functional equivalent of the streets and sidewalks of a normal municipal business district, the owner of the shopping center may not, using the authority of the government, exclude from the property those who wish to exercise their First Amendment rights but may place only reasonable time, place, and manner limitations on the exercise of First Amendment rights. (*Food Employees* v. *Logan Valley Plaza* (1968) 391 U.S. 308, 319-324 [20 L.Ed.2d 603, 612-615, 88 S.Ct. 1601] (*Logan Plaza*).) Citing *Logan Plaza,* the California Supreme Court, the next year, in 1969, reversed a trespassing conviction against a man who handed out handbills on the private sidewalk of a "large 'supermarket-type' grocery store" encouraging shoppers not to patronize the store because it advertised in a newspaper that was engaged in a labor dispute. (*In re Lane* (1969) 71 Cal.2d 872, 873 [79 Cal.Rptr. 729, 457 P.2d 561].) The

court held: "Certainly the paramount and preferred place given to the First Amendment freedom of speech right in our democratic system [citation] should be accorded precedence over the mere 'naked title' [citation] of market owner Stewart's interest in the premises." (*Id.* at p. 878.) Again, the court did not mention the California Constitution.

Reversing the trend and recognizing the rights of private property owners, the United States Supreme Court, in 1972, held that the owners of a private shopping center could prohibit handbilling protesting the Vietnam War within the shopping center because the handbilling was unrelated to any activity within the center and the handbillers had "adequate alternative avenues of communication," that is, they could handbill elsewhere. (*Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551, 556 [33 L.Ed.2d 131, 141, 92 S.Ct. 2219], overruling *Logan Plaza, supra*, 391 U.S. 308, as acknowledged in *Hudgens* v. *NLRB* (1976) 424 U.S. 507, 517-518 [47 L.Ed.2d 196, 205-206, 96 S.Ct.1029].) The court concluded: "The basic issue in this case is whether [the handbillers], in the exercise of asserted First Amendment rights, may distribute handbills on Lloyd's private property contrary to its wishes and contrary to a policy enforced against *all* handbilling. In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on *state* action, not on action by the owner or private property used nondiscriminatorily for private purposes only. The Due Process Clauses of the Fifth and Fourteenth Amendments are also relevant to this case. They provide that '[n]o person shall . . . be deprived of life, liberty, or property, without due process of law.' There is the further proscription in the Fifth Amendment against the taking of 'private property . . . for public use, without just compensation.' [¶] Although accommodations between the values protected by these three Amendments are sometimes necessary, and the courts properly have shown a special solicitude for the guarantees of the First Amendment, this Court has never held that a trespasser or uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." (*Lloyd Corp.* v. *Tanner, supra*, 407 U.S. at pp. 567-568 [33 L.Ed.2d at pp. 141-142], italics in original.)

Particularly applicable to the facts of the present case was this pronouncement in *Lloyd*: "Nor does property lose its private character merely because the public is generally invited to use it for designated purposes. Few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there. Nor is size alone a controlling factor. The essentially private

character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center. . . . Fifth and Fourteenth Amendment rights of private property owners, as well as the First Amendment rights of all citizens, must be respected and protected. The Framers of the Constitution certainly did not think these fundamental rights of a free society are incompatible with each other. There may be situations where accommodations between them, and the drawing of lines to assure due protection of both, are not easy. But on the facts presented in this case, the answer is clear." (407 U.S. at pp. 569-570 [33 L.Ed.2d at p. 143].) The California Supreme Court submitted to the authority of *Lloyd* and fell in line in its analysis of free speech rights on private property, recognizing "[u]nder the holding of the *Lloyd* case, the due process clause of the United States Constitution protects the property interests of the shopping center from infringement [citation] [and] . . . supremacy principles would prevent us from employing state constitutional provisions to defeat defendant's federal constitutional rights." (*Diamond* v. *Bland* (1974) 11 Cal.3d 331, 334-335 & fn. 4 [113 Cal.Rptr. 468, 521 P.2d 460].)

If it was clear citizens are not entitled to exercise, in a privately owned shopping center, their free speech rights with speech unrelated to the business being transacted on the property and against the wishes of the property owner, there can be no dispute the same can be said of a freestanding bank. That the bank's business is money and the solicitors ask for money do not make the speech related to the business. The solicitation may be opportunistic, as is the political handbilling of shoppers in a privately owned shopping center, but not related. Furthermore, the solicitors had other places to exercise their free speech rights. In this regard, it is irrelevant that solicitation from the public sidewalk would not be as lucrative as solicitation from the bank's private sidewalk; "adequate alternative avenues of communication" includes all of the appropriate alternatives to soliciting on the private sidewalk of this one bank. (See *Diamond* v. *Bland, supra,* 11 Cal.3d at p. 335.) Accordingly, the preliminary injunction does not violate the solicitors' First Amendment rights.

If the California Supreme Court had continued to construe all free speech rights using the standard of the United States Constitution our analysis could end here. However, in 1979, citing the California Constitution, the California Supreme Court held that the owner of a shopping center could not prevent political solicitation of signatures on the premises. (*Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908-911 [153 Cal.Rptr. 854, 592 P.2d 341].) It noted that the states retain the right to regulate the use of private property and, since they may impose such regulation, it could and

did impose a requirement that private property owners could not prohibit free speech and could impose only appropriate time, place, and manner restrictions. (*Id.* at pp. 909-910.) In support, the court cited article I, section 2 of the California Constitution which states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (23 Cal.3d at p. 908.) *Robins* overruled *Diamond* v. *Bland, supra*, 11 Cal.3d 331, and resurrected cases such as *In re Hoffman, supra*, 67 Cal.2d 845 and *In re Lane, supra*, 71 Cal.2d 872, converting them into state, rather than federal, law precedents. (*Robins* v. *Pruneyard Shopping Center, supra*, at pp. 908-910.)

While the general holding of *Robins* would appear to end our inquiry, it does not. In *Robins*, the court remarked: " 'It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of *a modest retail establishment.*' " (23 Cal.3d at p. 910, italics added.) Subsequently, the Supreme Court has never elaborated on this remark and has not revealed if it means the holding of *Robins* does not apply to modest retail establishments. In the meantime, however, the Court of Appeal has determined that the Supreme Court at least intimated the holding does not apply to modest retail establishments and, consequently, has not applied the holding to what it determines are modest retail establishments. (See *Feminist Women's Health Center* v. *Blythe* (1995) 32 Cal.App.4th 1641, 1673 [39 Cal.Rptr.2d 189].) That determination has been on a case-by-case basis which we summarize here.

The Court of Appeal has found the following are modest retail establishments for the purpose of state free speech analysis: a 14,000-square-foot medical office building, in which retail sales were prohibited, with an adjoining 12,000-square-foot medical office building and a shared 145-space parking lot (*Allred* v. *Shawley* (1991) 232 Cal.App.3d 1489, 1494 [284 Cal.Rptr. 140]); a 3-story medical building with 6 tenants and a parking lot for use by tenants and patients, not the general public (*Planned Parenthood* v. *Wilson, supra*, 234 Cal.App.3d at pp. 1671-1672); a medical center with 19 tenants and 3 vacant suites, with 2 parking lots including 256 parking spaces reserved for patients only (*Allred* v. *Harris* (1993) 14 Cal.App.4th 1386, 1388, 1391-1392 [18 Cal.Rptr.2d 530]); and a 2-story (at least) medical office building with several tenants, including physicians and a pharmacy, and a 40-space parking lot reserved for tenants and their clients and visitors (*Feminist Women's Health Center* v. *Blythe, supra*, 32 Cal.App.4th at pp. 1654, 1660-1661). The finding of a "modest retail establishment" has been bolstered when the establishment did not provide a

place for the general public to congregate and catered to a specific clientele, thus making it less "public." (*Allred* v. *Harris*, *supra*, at p. 1392.)

Consistent with *Robins*, the Court of Appeal has applied state free speech law to large shopping centers. (See, e.g., *Westside Sane/Freeze* v. *Ernest W. Hahn, Inc.* (1990) 224 Cal.App.3d 546 [274 Cal.Rptr. 51].) Whatever "modest retail establishment" means, it does not include a large shopping center and, in light of *In re Lane*, *supra*, 71 Cal.2d 872, decided before *Robins* but relied on in *Robins*, it also does not include a "large 'super-market-type' grocery store." (*Robins* v. *Pruneyard Shopping Center*, *supra*, 23 Cal.3d at pp. 908-909.)

The Bank is comparable to the modest retail establishments in the cases cited. It is a two-story, single-purpose building with an adjoining parking lot reserved for customers. It does not provide a place for the general public to congregate; indeed, security issues would make it undesirable to have the general public, that is, those who do not need to transact business with the Bank, present. Generally, only those who are transacting business with the Bank are invited to the property. The Bank bears no resemblance to the 21-acre shopping center in *Robins*, where the owners lured a large number of people daily to congregate and take advantage of the amenities offered. (*Robins* v. *Pruneyard Shopping Center*, *supra*, 23 Cal.3d at p. 902.)

The Church tries to distinguish the cases construing "modest retail establishment" by labeling the Bank's building as "gargantuan." The hyperbole is unavailing. The building is two stories and about fifteen thousand square feet on the ground floor. The parking lot covers approximately one-quarter of a block. The size is not out of proportion to the modest retail establishments noted above.

While it is apparent the Bank is a modest retail establishment, we must deal with one additional matter. When the court decided *In re Hoffman*, *supra*, 67 Cal.2d 845, it included a footnote which, on its face, applies to free speech analysis when the speech takes place in a bank. (*Id.* at p. 852, fn. 6.) The court opined that the owners of the railway station could ask anyone interfering with the conduct of the railroad business to leave and, in a footnote, added: "Of course, the degree of interference with business operations need not reach the level attained by the defendants in the 'bank-in' cases [citations] before a proprietor may demand their removal. As stated above, any appreciable interference with the orderly carrying on of business may suffice. A bank may well have security problems akin to those of a jail, that permit it altogether to prohibit First Amendment activities inside

its premises. [Citation.] Some interference, however, must be shown. [Citation.]" (*Ibid.*)

We do not read this footnote in *Hoffman* as requiring a showing of interference, as the Church would have us do, before allowing the prohibition of soliciting on the Bank's property. As we stated, the general holding in *Robins* does not apply on the private property of a modest business establishment. Only when the forum is public, which in California includes large shopping centers and supermarket-type stores, must a private owner show interference with the operations of the business in order to prohibit the free speech activities.

Since the Bank is a modest retail establishment and there is no controlling precedent applying the holding in *Robins* or state free speech law to modest retail establishments, we only need to measure the prohibition of free speech on private property in this case against federal law. As we explained above, the injunction here does not violate federal free speech rights as announced in *Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551, because the soliciting is unrelated to the Bank's activities and the Church can solicit elsewhere. Accordingly, it is likely the Bank will prevail on the merits.

The other prerequisite for a preliminary injunction involves balancing the harm to the plaintiff and defendant if a preliminary injunction is granted or denied. (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 69-70.) In the unique setting of free speech rights versus private property rights, this harm analysis is the same as the analysis concerning the likelihood of success on the merits. The point of cases such as *Lloyd* and *Robins,* when free speech and private property rights collide, is to determine which right, under the circumstances, is more worthy of protection, or, stated differently, which right, if left unprotected, will lead to the most constitutional harm. Any donations or business lost by the Church or the Bank in the event the preliminary injunction is granted or denied is of only secondary importance, and, when one right clearly prevails over another, as it does here, the money issue need not be considered. Under the circumstances of this case, we cannot force the Bank to forfeit, even temporarily, its private property rights because of the prospect the Church will obtain more donations pending trial. We must conclude, therefore, that the harm to the Bank without the preliminary injunction outweighs the harm to the Church with the preliminary injunction.

The trial court did not abuse its discretion in granting the preliminary injunction.

## DISPOSITION

The judgment is affirmed.

Scotland, Acting P. J., and Morrison, J., concurred.